in who you represent. Before we start, I'll let you know that Justice Simon is a little under the weather, and he'll be listening to the tape of this argument as soon as he can. Please call the first case of argument. 12-07-8484, Paul Mercury Insurance v. The Peoples Gas Light & Coke Co. For the Appellant. Good morning. For the Appellant, Julie Tischer from Cassidy, Shawnee. Good morning, Your Honor. Ed Leahy on behalf of Argo Securities Systems, the Appellate, and the Cross Appellant. I can assure you that we've read the briefs and looked at the pertinent portions of the record, so it would behoove you to get to your strongest points first. And, of course, Ms. Tischer, you'll have plenty of time for reply any time you're ready to start. Thank you. May it please the Court. The issue that's presented before you today is whether Argus had a duty to prevent or report the delivery of a large propane gas tank to a commercial building in the City of Chicago. After nine years on this job, with three security guards on duty, with 80 surveillance cameras covering the first floor of the building, the elevators in the building, and all floors of this building, with a security manual in place that required these guards to report every and any situation that could lead to property loss or property damage, did Argus have a duty? Where Argus' security guard testified that he had previously stopped people trying to enter the elevator, where an Argus security guard has testified that if he had seen a tank coming into this building, unlike what he was used to, a green, thin tank, that he would have asked the individual what was in the tank. Did this tank come through the front door where customers or did it go through the back onto a freight elevator? We don't know what door of the building this came into. It's not part of the record. But we know that it came into the building and we know that it went up on an elevator to the sixth floor. In 2000, there was another fire problem, right, natural gas, northern, the gas company turned off gas to the building. That's right. And then Mahler sent out a letter, right, to the tenants suggesting that they contact their oxygen tank providers to discuss alternatives, and that would be alternatives not to oxygen but to natural gas, correct? Yes. So that would mean propane generally, right? There may be some other gases out there, but Propane was not referenced in the memo, but it may be referenced. What else would replace natural gas, if you know? Yes, nothing that I can think of, right. Kind of mean, I'm just saying, I think it's propane. So I think they're telling them, by the way, if you need to melt the stuff, which is what jewelers do, repair things and make them, then you should get the propane from them. And even after this explosion, that was at page 7 of your brief, at page 11 of your brief, you point out that after the explosion, a new procedure was established. And even that, Mahler's, the management company, decided they were going to allow in canisters from Ford Delivery Services, as opposed to, you know, who, golly know who, and that would also be propane, wouldn't it? No. After 2002, it was not supposed to be propane. And if I can go back and answer your first question first, in 2000, people shut the gas off to the building, advised the tenants they could use alternatives in order to conduct their business until the gas was reenergized. Once the gas was turned back on in 2000, Peoples and Mahler's instructed the tenants that they could no longer use propane gas. In fact, there's testimony in this record that Peoples instructed that they wouldn't reenergize the building until the tenants had complied with certain things, including removal of propane tanks from the building. So that was the status in 2000. But that's Peoples' gas today. You're absolutely right. That's in the briefs. And they talk about Peoples' gas being insistent. We're not going to turn on for individual tenants their natural gas until we know propane is not in there. Otherwise, the propane would explode, the natural gas would be a very bad thing. But where in the record would we find that Mahler's said to the tenants, is there anywhere in the record where it's documented, preferably a document or any other way, where Mahler's instructed the tenants that they're not allowed to have propane, ever? I don't believe there's any written documents in this record that Mahler's made that communication to the tenants. Jay Richman has testified that propane was not to be in this building outside of that interval where the gas was turned off to the building. After April of 2002, when this explosion occurred, the building manager said to Argus, you need to be checking these people coming into this building. We want you to report to us. When a delivery man comes in with a tank, report to us and send them up to our office. We want you to do your job. That's why we have you in this lobby to monitor for this type of explosion. That's right. So that's part of the explosion then, clearly. They weren't doing that, right? There was no sign-in. Mahler's did not ask Argus security to notify the management office when propane was coming through the loading dock. That specific directive, no. But, that specific directive, no. I can't stand before you and say that we put that in writing or that we said you need to inspect a tank before this explosion. But, Well, they wouldn't be able to inspect a tank, right? The security guards make $9 an hour. I said if you wouldn't want them anywhere near a tank of propane, it would be a bad idea. Right. And when I say inspect a tank, I don't mean to perform a scientific test to determine that it's propane. I mean, I see a big tank. I need to figure out what's in the tank. I need to ask the right question. That's what I'm talking about. The propane tanks, the record estimated, I believe, at about 100 pounds. It's not a tank that can be carried up the stairs. It's a large tank that comes into the building on a cart and is moved in an elevator. The contractual terms between Mahler's and Argus, what does it say about tanks and propane? The contract says nothing about tanks and propane. But, what it does say is that Argus shall perform such security services as the client shall request and that Argus shall perform the security services as outlined according to the post orders. Then we get to the security manual. The security manual is a 125-page document that Argus authored for security services at this building. Inside that security manual, Argus' own language suggests that the procedures are designed to minimize and prevent losses to the client due to security and emergency conditions that can result from fire, theft, and explosions. Argus in its own language said the guards had to observe and report any violations of rules, observe and report any problems, report any and every situation which might lead to damage or loss of property. Every and any situation. That's Argus' words without limitation in a security manual that they wrote for this building. You cite in there your reply brief. Again, I understand these guys make $9 an hour and there's nothing in writing that they were to make notes of propane. So you say Pippin with CHA, some young lady named Pippin was murdered or harmed or stabbed, let's just say stabbed by an acquaintance. In the holding in Pippin by the Supreme Court, and they look to the restatement seconded towards 324 AC. So it's where the reliance of the other or of the third person has induced him, in this case the him would be Mollers, to forego other remedies or precautions against such a risk. The harm results from the negligence as fully as if the actor, in this case Argus, had created the risk. So what remedies or precautions did Mollers forego in reliance on any inducements made by Argus in the area of propane tanks? What do we have on that? We hired a security firm to guard this building with millions of dollars in jewelry for the specific purpose to prevent loss or damage of property from things like explosions. Okay. We relied on, we hired experts in the industry. We put them down there. We gave them 80 surveillance cameras. We allowed them to put three people in our building for the shift in question. One monitoring the video feeds, one supervising the entire building, one operating the freight elevator on which the tank would have gone up. We said to them, this is your duty. We're putting you here to stop, monitor, prevent, report anything that could lead to damage or loss of property in this building. We relied on them to do that job. Now, we didn't ask them to figure out if somebody had an envelope in their pocket with something dangerous in it. We said, monitor, report, and prevent things that could lead to damage of property in this building. Rolling in a huge propane tank, well, again, I would remind the court that Argus drafted the security manual, any and all. They drafted it. They wrote it. They wanted the business. It sounds like you're trying to pitch us to impose an after-the-fact duty. No. I don't think it was an after-the-fact duty. In fact... All of a sudden, we all know, oh, propane, it can explode. They should have told us. Well, we're not asking for an unreasonable vigilance here. We're talking about a propane tank that's rolled into a building, and all it would have taken was what's in the tank. Well, let's go there real quick. All would have taken what? What's in the tank? Is it propane? It's compressed air. Well, let's go with what it was, propane. So they tell the operator, the freight elevator, so they took hundreds of canisters. I still believe he still does. It's propane. Okay. Where are you going? I'm going to Betty's. Betty's. Okay, great. Get in the elevator. And they roll them over. They bring them up to six. The next door neighbor lets them in because Betty's is closed. Well... What was the freight elevator guy supposed to do? He was supposed to either call his supervisor and say, there's a tank of propane here. In light of the 2000 occurrence, is this something I should be letting into the building? He could have called the office of the property manager and said, I've got a tank of propane here. Supposedly, in context, even though there was nothing in writing at that time, in 2002, requiring the elevator operator to even keep a note of who came in, right? Where he's going, there's no requirement by anybody to write anything down or who came through the loading deck. Let's say he did take the next step and notified the supervisor of the two employees. By the way, I just took out a 100-pound propane tank going up to Betty's. What's supposed to happen next? They would have and should have said, propane is not allowed in this building. And based on what? Based on the directives that were given after the 2000 explosion. But those directives do not, from your building, don't say, this is dangerous, don't let in propane, right? That is nowhere, right? Because you can see that the first question we asked was, anywhere is Mahler saying, writing, by the way? And there's no testimony by anybody of Mahler saying, and by the way, we told Argus to not let any propane in prior to the explosion. There's no testimony to that. Nothing that specific. So what you want then, are you not, if we were to agree with you, aren't we saying, I assume these are fairly standard contracts, aren't we making security companies, guarantors of bad things not happening, that their insurance will have to pay rather than the building's insurance? Should anything go wrong, there be an explosion, an armed robbery, whatever it is, right? I don't think we are, and here's why. Why? We've got the incident in 2000 that creates the awareness, okay? We've got a gas explosion in this building. We have people's gas coming in and saying, okay, we're going to re-energize the building, but you've got to get rid of all of your alternative sources of gas, including propane, okay? So we've got that knowledge. We've got a security company that's been there for years, for nine years, knows about the incident in 2000, knows about the explosion. We've equipped them as best we can with security cameras, with guards, and we're not, again, we're not talking about something that's undetectable. We're talking about something that can be observed by standing there on a monitor, certainly in the elevator, and all we're asking is that they would have made the call and said, should we let this propane tank up? And the answer would have been no. Jay Richmond testified to that. Propane was not allowed in this building outside of that interval where the gas was turned off. He didn't testify at all that he told Argus that they were not to allow propane in, right? He was not asked that, and he did not testify to that. In addition to the security manual and the contract here, we have the testimony of the Argus employees. Harvey Borders was the Argus employee on duty on the date this explosion occurred in April of 2002. He said before 2002, tanks had to be taken up on a freight elevator. Before April 1, 2002, he had stopped people trying to bring tanks through the lobby onto a passenger elevator. He also testified that if he had seen a tank that was unlike the thin, narrow tanks he was used to, he would have stopped the delivery person and would have asked what was in the tank. That's an Argus employee. But again, what's the next step? Unless they say, well, I've got propane. Okay, get in the elevator. I'll take you up to Betty's or wherever you're going to go. What floor are you going to? Well, the argument here is a jury should get to decide, Justice Quinn, whether at that moment, with a propane tank on the freight elevator, under everything that the Argus guard knew, should he have made that phone call? Should he have called Jay Richmond and said, are we supposed to let propane tanks in? I know that after 2000, we're not supposed to have propane in this building. That's all it would have taken, and it was for a jury to decide under the terms of this enormous security manual with the history of the duties that they had previously undertaken. As you can imagine, Counselor, it's not often that we have insurance companies up there saying, duty is not a question of law. No, it's a question for 12 pairs of shoes. That's what we need. We need people to come off the street and decide what we should do. And we don't hear that very often. I don't mean to make fun of you, but that's what this is. And no, a duty is a question of law. It has been a question of law. Thank God. And I don't say that as an anti-plaintiff person, but as somebody who thinks it's just fair that the duty should be determined by somebody who does it for a living and not somebody off the street. And why should we change it? I'm not asking you to change that well-settled principle of law. The existence of the duty is a question of law. Even Argus won't tell you they didn't have a duty. They had a duty to provide security services as the client shall request. And the whole point of all this is that security services at the client's request, that requires interpretation of the language. That language has many different meanings. Argus in its security manual provided some of the definition for those terms, but that term is by nature ambiguous. And once you get to an ambiguous term like that, it's inappropriate for the trial court to ascribe its own meaning. What did security services at this client's request mean in this setting? Nobody's questioning the existence of a duty. So let me answer your quote. As the client shall request. There's no evidence in this record, is there, that in writing or in testimony, that Mahler's ever instructed, requested, Argus to not allow in propane tanks. That's correct. But what they did say, what Jay Richmond testified to, is that he advised the guards, you need to determine why people are in this building, what they're doing here, for what purpose, and if it's inappropriate, you need to escort them from the building. But the vast majority of that, as explained, was for bums. I know they're called homeless people now, but they don't want panhandlers hanging around the jewelry, which is a good idea. But those duties were in no way limited in that regard, according to the terms of the own manual that they wrote. I mean, when you take on the responsibility to prevent loss of property by any and all means, report any and every situation that can result in property damage, and you don't limit that duty, and that's something that you write yourself in order to get this contract, what we're saying is the jury should be allowed to determine, did the failure to stop a big, dangerous tank of gas coming into this commercial building, did Argus' failure to say, hey, wait a minute, I've got to check on this, was that something that was covered by the terms of the contract, the security manual, and based upon their prior behavior? They had redirected people bringing tanks into this building before. Away from the, as Justice Harris' first question was, away from the front door where people are going in to buy jewelry and hopefully wedding rings. They don't want them to be sharing an elevator with a large tank or propane or oxygen or anything else. But doesn't that say that they undertook the duty to monitor the traffic that was coming in and out of the building, specifically to redirect somebody bringing in a tank, no matter what was in the tank? It doesn't mean stop them. Under what authority would they have to stop it? And what I'm saying is they could have reported it. They could have reported it, they could have said, wait here. They didn't need to say, you need to leave right now. Their obligation was to do whatever they needed to do to prevent property damage in this building. Well, not everything. Some of the regulations here say that the security people are not in the position to judge who should or should not have access to the building. It talks about they should not be put in the position of involving, inspecting deliveries. It's the tenant that's responsible for what's in their premises. It seems it's rather loose. There's 12 examples given, none of which talk about your situation. That language is all in the security manual in addition to the language asking them to report, to monitor, to prevent any incidents that could lead to damage to the building. That's why it's a question of fact. That's why a jury should have been allowed to decide this. Because the manual gave these security guards certain responsibilities. And whether or not this particular incident fell within the general language, we think should have been decided by a jury. Do you want to cover anything else? I can address the statute of limitations argument if the court needs to hear me about that. That's covered, I think, adequately in the briefs. There's no statute of limitations argument here. There's also an argument as to the release. If you need me to address that, I'd be happy to. The other one in front of us is the expert witnesses, I believe. The expert witness affidavits. I think they complied with 191. Were they bare bones? Yes. Mr. Howrey in particular said that these security guards, he's an expert in security, and his affidavit, he attested that these security guards had the obligation to prevent delivery of propane gas to a commercial building. And I think under the law that that opinion is admissible on the interpretation of their duty under this contract. And a standard review on that would be abuse of discretion, would it not be? I don't believe so. Not when considered in conjunction with a motion for summary judgment. On a motion to strike an affidavit in response to a motion for summary judgment, I believe this court reviews that de novo as well. Well, thank you. You have time for reply after they make their argument. Thank you. Mr. Leahy. First of all, my client wishes to tell you that she wishes she could be here, but she's down in Florida and couldn't make it up here for the arguments. Is that Mrs. Argus? It's Janet Joyce, who is the co-owner of Argus. If you don't mind, I'm going to address the last argument real quickly here on the affidavits. I believe it is a matter of discretion with the trial court. And if you look at Village of Glenview versus Northdale Woods Water and Utility Company 216 LF 3rd 40 at page 48, it says it's within the discretion of the trial court to determine what it would review in terms of even if it found an ambiguity, what it would use to assess the ambiguity. So it is, in our opinion, the law that it's up to the trial court and the discretion of the expert's affidavits. We addressed in our briefs the defects that continue with them. There is one defect, I believe, that stood out in this and that is these experts never did identify what they reviewed to even make those opinions. So they're not even using their opinions to interpret words of the contract. But later on they amended them, right? Because that was your initial objection and then I thought they filed an amendment. So all right, by the way, here's what we looked at. Notably the Argus manual and other manuals you'd find out. But they never did do what I think St. Paul wants the court to do is look at the opinions in terms of interpreting the words that are ambiguous. And they never do that. And I think that's one of the soundest reasons for the trial court to have disregarded those and struck those affidavits, Your Honor. If I can, I'm going to move to the main argument here. And what I heard here is what I've seen in the briefs and all along. And to me, this is a clear expansion of a duty where the law has clearly said you're not to expand the duty beyond the contract. Now, I don't believe that there's any ambiguity anyways. I believe if you look at the trial court what the trial court did is took the words security services and said alone, just alone those two words could be ambiguous. But when you put it in the context of the whole sentence it's security services that were requested by the client. I don't think there's any dispute there. When you look at it in that sense, it's not ambiguous. There's no discussion even before the judge mentions the word ambiguous in her ruling. But there's not even any review of what words are ambiguous. What words are susceptible to two different interpretations in that contract because it says security services as requested by the client. So what the court did, and I think correctly, is just analyze where is it that you request these services with the understanding that it has to be specific and it can't be expanded. And I think that's what we did. In any way, shape, or form you look at the contract or the manual, there's nothing in there that says that they were going to specifically check any packages being brought into the premises let alone propane tanks. Or any tanks. And the one thing about that is this is something that's well known. It was always known that tanks were being brought into the premises. Mr. Richmond readily acknowledges that as he readily acknowledges that he never ever requested that Argus check the tanks being brought into the premises. And I think that's a significant thing in the law because the quality of the security guard that would be required to do that type of thing is different than the $7, $8 an hour. And they could staff it differently if they did that. But it was really up to, the contract's clear, it was up to Mallers to request the services they knew tanks were being brought into, and if they wanted tanks to be checked, they could have done that. And they never did. They never did in this case. And I think you're absolutely right, Your Honor, there's nothing in any of the testimony or anything in that manual that says that they're going to check packages. That's a whole different effort. I think Judge Brewer knew that, that the type of effort they're talking about, and that's why I'm getting into the expansion. It's sort of an expansion. You look at the Daly Center and you look down the security downstairs and the security's completely different. They're checking cars, they're checking things being brought in. That was not what was being done in the Mallers building. It was free access to the building, Your Honor. And to require Argus and the three-man staff that were there to then check packages was a completely different task than they ever agreed to before. Well, it wouldn't be hard to check 100-pound tanks of propane, right? Since one of the employees had moved from Argus Security into the freight elevator, and these things are gigantic. He saw these things and had their bed instructions from Richmond to the elevator operator every time a large tank of gas comes in here, send me a note. Richmond could have done that, right? He could have done it, and he did do it after the fact. And it wouldn't be difficult for the freight elevator guy to fill out a piece of paper or slip and say, by the way, I took a 100-pound tank of propane up to Betty's. I agree with you 100%, Your Honor, in that regard. There's a lot that could have been done, and we're not here. Maybe the incident doesn't occur if Mallers requested the type of services they were looking for. Maybe. I don't know for sure, because gases were going to be brought in anyways. There's all sorts of things that were supposed to be brought in there. The argument here is maybe propane wasn't supposed to be in there. That was the tank that exploded, but certainly other tanks were being brought in, and they needed to do their work, okay? But if they wanted that services and they requested it, maybe we're not here. But it wasn't, Your Honor, and I think it's patently unfair under the facts and the law to expand the duty after the fact to include that. And I think that's the fundamental premise. We're going to fundamental fairness in contract law. They had agreed to request services and pay for them. There's another essential element here. They were going to pay for those services. That's part of the contract. And they never did ask for that service or request it as they were allowed to under the contract, Your Honor. When did this thing explode? During business hours or was it at night? It was in the late afternoon hours. Any personal injuries involved or just property damage? There was one personal injury that I'm aware of. The neighbor? I think that was Mo Adano was a witness. I think there's some testimony from Mo Adano in there, too. But there was an injury, Your Honor. I think actually my understanding was I was involved in that case. There was a firewall explosion, and he came out of his suite to see what it was, and then he got... It was the guy that let him in, right? Right, he's the one who let him into Peacock's suite. But just going back in terms of the big picture here about security companies, Argus also has been held to be on the hook in some manner or form in a large way. At least in terms of defending. 69 West Washington, is that right? Right. But the argument there is also dependent on the contract language between that landlord and Argus. Would that be right? Without knowing that, I would think that's the case. I think that's the law. It's in the contract. So my point is this. While St. Paul appears to me to be a stretch, it's not unknown that security companies and their insurers can be held on the hook for disastrous events, even though I don't know what they could have done differently in any of these things. If you write a contract that we're on the hook, you're on the hook. Right, Your Honor. That might be why they're all going out of business. I would imagine it's the insurance. I know it's not the overpay for the guards. I'm reasonably certain that's not the problem. And even on that note on insurance, I mean, there's options here in reliance. One of the key aspects of the restatement is that there's an element of reliance that they're going to do, and that's clearly not here. I mean, Mr. Richmond knows what's going on. He has the right, if he says that he thinks propane is not appropriate for the building, he could put that in the lease agreements with his tenants and say, you can't bring it, and then inform the security guards that enforce that. But that's not in any way, shape, or form what he did either. And so for him to claim, which actually I don't think it's him. I think this is sort of a fabrication after the fact to try to get a duty established. But Mr. Richmond, he can't really say that there's detrimental reliance here because he knows the tanks are being built. He knows this, and all he can testify to is he asked the guards to maybe check to see if somebody was in here and find out the reason. But even if they asked that question, even if they did follow up with that and the person said they were here to make a delivery and showed a delivery document, the fact of the matter is they would have let him in anyways because they showed a basis to be in the building. And that's all they did. But I know that, you know, Mr. Richmond knew that this was going on, and if he wanted that services, he could have asked for it. I think he chose to insure it instead, and that's what he did with his money instead of pay Argus. Anything else? I don't think so. Thank you. There is no evidence in this record that Jay Richmond knew that propane tanks were being delivered after the building was reenergized in 2000. It's a misrepresentation of his testimony. He knew propane was allowed during the interval where the gas was turned off to the building. He specifically indicated in his testimony, and I'll find the pages for you. I believe it's 519 of the record. He specifically testified that he knew during that interval propane was being delivered. After the building was reenergized, he had no knowledge of any propane being delivered to this building. That was something that was represented in Argus' briefs and stated just now and if you look at the testimony, it's simply inaccurate. When he was asked that question, he limited that knowledge to the interval where the gas was turned off to the building. We are not asking this court to expand on the duties under the contract in the security manual. What we're saying is this case involves interpretation of language. The interpretation of the language in the documents, the interpretation of the duty based on what these Argus security guards had done for nine years. That's a question of fact. The trial court said it. She said, when we see security services, I mean, it's such an ambiguous term. What are security services? She made the point. Those services can vary from building to building and location to location. Then she improperly ascribed her own meaning. After finding, the security services can have many meanings. She chose one. What we're saying is, I'm not saying we win today. What we're saying is, under these facts, with this security manual, drafted by a company that's been doing this for years, that promised to observe, report, prevent, monitor pedestrian traffic, monitor elevator traffic, what we're saying is only, let a jury decide if Argus agreed to do something as simple as say, is that propane in that tank? What have you got in that tank? We're not asking them to inspect packages. This was a huge tank rolled into a commercial building. All we're asking is for you to allow a jury to say, you know what? Argus may have agreed to do that. This was not a question of law to be decided by a court. This involved the interpretation of language. And the meaning of language is a classic question of fact. This court well knows. This comes here on summary judgment. The depositions, the documents, the testimony, has to be strictly construed against the moving party. If the language is ambiguous, it's improper to make a determination as a matter of law. That's all we're saying. And we'd ask that you reverse this case, send it back to the trial court, so that a jury can make the determination. Thank you very much. Thank you for the arguments and the briefs. And this case will be taken under advisement. And this court will be adjourned.